NOT DESIGNATED FOR PUBLICATION

No. 123,836

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHARLES D. BLAKE,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed March 25, 2022. Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., ATCHESON and WARNER, JJ.

PER CURIAM: Charles D. Blake appeals the district court's order denying his motion for postconviction deoxyribonucleic acid (DNA) testing under K.S.A. 2020 Supp. 21-2512. For the reasons stated below, we affirm the district court's decision.


FACTUAL AND PROCEDURAL BACKGROUND

In 2005, a jury convicted Blake of aggravated criminal sodomy and aggravated indecent liberties with a child under 14. The district court sentenced him to 264 months' imprisonment, and this court affirmed his convictions on direct appeal. *State v. Blake*,

No. 95,098, 2006 WL 3353770, at \*6 (Kan. App. 2006) (unpublished opinion). In its opinion, this court recited the facts of Blake's case:

"In December 2004, Charles Blake was charged in Sedgwick County district court with one count of aggravated criminal sodomy in violation of K.S.A. 21–3506, attempted rape in violation of K.S.A.2005 Supp. 21-3502(a) or, in the alternative, aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3), and aggravated burglary in violation of K.S.A. 21-3716. The named victim in the sex charges was [J.D.]

"[J.D.] was 10 years old on October 30, 2004, and lived with her mother and three brothers: [M.D., K.D.], and [S.L.]. On that afternoon, Blake had been in [J.D.]'s house with [J.D.]'s older brother, [M.D.], in order to borrow some of [M.D.]'s clothes to go on a date. According to [M.D.], Blake took the clothes to his own house to change and did not leave any clothes at [J.D.]'s house.

"That night, [J.D.]'s mother was gone. [J.D.] and her younger brother, [S.L.], had gone to sleep on her mother's waterbed. [K.D.] and [M.D.] were supposed to be watching them. At some point, [J.D.] awoke to find Blake on the waterbed. Blake removed [J.D.]'s underwear, removed his pants, loomed over her, and rubbed her front private part with his penis. Blake then put his finger or something else inside her bottom.

"[S.L.], who was 6 years old, testified he was sleeping with [J.D.] in his mother's waterbed. [S.L.] woke up and saw Blake in the room removing his belt and dropping his pants. He saw Blake getting on top of [J.D.] on the bed and start humping her. [S.L.] tried to choke Blake but was pushed off the bed. [S.L.] then ran to the nearby home of his friend to get help. One of the neighbors called police.

"The neighbors confirmed the fact that [S.L.] arrived at their home very late. The wife heard a child crying and someone banging on their door. The husband let [S.L.] into the house. They had difficulty understanding [S.L.] because they spoke little English. Their older daughter finally told them that [S.L.] stated [J.D.] was being raped. They ran to [S.L.]'s home. The husband entered the bedroom and turned on the light. His wife followed; she saw [J.D.] on the edge of the bed wrapped in a blanket. They also saw a young man roll off the bed and pull up his pants; the young man told the neighbor he was a policeman. The neighbor identified Blake as the man in the room. They took [J.D.] to their house.

2

"Police were dispatched from a 911 call at approximately 4:08 a.m. After police arrived, [S.L.] advised them Blake lived in a nearby house; the police went there, and Blake was taken into custody.

"Blake was placed in a police car where he initiated a conversation with the officer. Blake stated he did not understand why he was arrested. Blake volunteered he had had sex with two girls earlier in the day, one of which was having her period, and that he still probably had 'her blood on [his] balls.' He also told the officer 'child molestation's not [his] crime' and that he heard the girl was getting raped and went over to help. Blake appeared intoxicated.

"That night, [J.D.] told a police officer that she had been awakened by her brother. She indicated she had gone to sleep with underwear on, but her underwear was off when she awoke. [J.D.] initially told the officer she could not remember what happened; she appeared calm in her demeanor. She seemed hesitant to talk to the police, so the officer referred her to the Exploited/Missing Children's Unit.

"[J.D.] was taken to a nearby hospital for a sexual assault examination. She told the nurse she did not remember anything but that her younger brother saw something. [J.D.] exhibited a flat affect and only commented that Blake would not be a friend of her brother's after this. [J.D.] reported to the nurse she had gone to bed in a t-shirt and panties, but the panties were gone when she woke up.

"The nurse's examination found no injury to [J.D.]'s vaginal area but did find three lacerations to her anus, which were likely caused by blunt force penetrating trauma. The nurse took swabs of [J.D.]'s vagina and anus; in taking the rectal swab, the swab was inserted so that 3/4 of the swab's tip was inside the anus.

"Another detective talked with [J.D.] at the hospital. [J.D.] did not tell this detective what happened because she was scared and embarrassed. It was not until she talked to another detective about a week later that she told the police what happened.

"Later in the trial, during cross-examination, [J.D.] admitted she had made inconsistent statements about the incident. For example, at the preliminary hearing, [J.D.] testified she did not realize it was Blake on top of her until the neighbor turned on the lights. She also testified at that hearing that when she awoke, Blake was initially standing near the bed, rather than on the bed. In addition, she admitted she told one of the detectives she could . . . not remember whether her underwear was removed. [J.D.] testified she did not initially tell police everything that happened because she was scared

and embarrassed. Before this incident, she thought Blake was like a stepbrother, and he had been at her house a number of times. She knew his family, too.

"After his arrest, penile and scrotum swabs were collected from Blake. These tested negative or inconclusive for any contribution from [J.D.], although the genital swabs contained a mixture of DNA from at least three individuals. Fingernail scrapings also were taken from Blake, however, there were no DNA tests ran on those scrapings. The first rectal swab taken from [J.D.] was inconclusive, but a test of another rectal swab reflected DNA profiles consistent with both [J.D.] and Blake. The likelihood of someone other than Blake contributing that DNA was one in 2.6 trillion in the Caucasian and Hispanic populations. The testing of the rectal swabs consumed all available samples, but the DNA extraction was preserved.

"Blake was interviewed by a detective later in the morning after the incident. Blake was read his *Miranda* rights and acknowledged he understood them. Although Blake admitted that he had been in [J.D.]'s home early in the afternoon, he denied being in the house anytime after the afternoon. Blake indicated he had an altercation with a Hispanic family on the street and this was how he learned that he was being accused of rape.

"He told a different story at his trial. Blake testified that he had sex with one woman, Pamela, on the morning of October 29, 2004, and did not shower after this encounter. He had a date later that day with another woman, Crystal. Blake borrowed some clothes from [M.D.] for that date. Blake testified he changed clothes while at [M.D.]'s house and left his own clothes in [M.D.]'s mother's bedroom. After having dinner with Crystal, they returned to her home where they ultimately engaged in sexual intercourse. Although he did not shower, he did clean up his genital area. Thereafter, Crystal dropped Blake off at [M.D.]'s house about 10 p.m.

"After drinking at a bar with [M.D.] and then at a party where he saw [K.D.], Blake then returned to [M.D.]'s house and entered the house as he had frequently done in the past. Finding [M.D.] was not yet home, Blake decided to change back into his own clothes and entered into the bedroom. He noticed the kids were asleep in the room. Blake found his jeans and unzipped his pants to change into his jeans. He tripped over something and fell onto the waterbed, landing on top of [J.D.] She awoke, moaning. Blake started to comfort her but realized she was not fully awake. He tried to get up to get finished dressing and saw [S.L.] run from the room; it was difficult for Blake to get off of the waterbed. [J.D.] was still partially asleep and moaning. Next thing he knew, the

4

room light came on and the neighbor lady was screaming at him and her husband was holding a lead pipe.

"The jury returned a verdict convicting Blake of aggravated criminal sodomy and the alternative charge of aggravated indecent liberties; he was acquitted of attempted rape and aggravated burglary." 2006 WL 3353770, at *1-3.

Blake argued on direct appeal that the prosecutor's closing argument deprived him of a fair trial. Finding no prosecutorial error, this court affirmed Blake's convictions. *Blake*, 2006 WL 3353770, at *1, 6. The mandate was issued on December 21, 2006.

On August 11, 2020, Blake filed a pro se motion for postconviction DNA testing under K.S.A. 2020 Supp. 21-2512. Blake's motion asked the district court to order testing of the DNA evidence in his case including, but not limited to, "all Samples/Swabs that were never tested in this case, the testing of all prior Samples/Mixtures to both ensure proper methods and practices were followed and to ensure the accuracy of the State's Laboratory results, which involved several testing irregularities in the original case." Blake alleged there were "[m]ajor [d]iscrepancies in [the] results" of the DNA testing, and there were "different and newer DNA techniques that would provide a reasonable likelihood of more accurate and probative test results."

The State responded and requested Blake's motion be denied, in part, to the extent that he was requesting testing on previously untested evidence that was no longer in the State's possession. The district court appointed counsel to represent Blake on the motion.

On February 18, 2021, the district court held a hearing on the motion. The State presented a property report as Exhibit 1 showing that much of the physical evidence from Blake's case had been destroyed by court order. The State also presented a laboratory report as Exhibit 2 which detailed the tested samples' results and showed the remaining evidence in the State's custody. The State informed the court that it retained custody of these samples: extracts remaining from J.D.'s rectal swab test; extracts remaining from

5

the first penile swab test; the second penile shaft swab; Blake's scrotal swab; Blake's penile glans swab; and the known standards for J.D. and Blake, respectively.

Blake argued that the State should not benefit from destroying evidence, even if it were authorized by court order. Blake argued that his untested fingernail scrapings would have provided relevant DNA analysis to show that he never placed his finger in J.D.'s rectum. Blake asserted that the district court should set aside or vacate his conviction or, at a minimum, hold a full evidentiary hearing on the matter.

The district court denied Blake's request for testing, finding that all evidence remaining in the State's possession had already been tested and anything not tested had been destroyed by court order five years after Blake's conviction. The court addressed Blake's request for testing on fingernail scrapings and noted that no testing could be performed on the fingernail scrapings because the State no longer had them. The court found no "major discrepancies" in the DNA results but noted that this court's unpublished opinion of Blake's direct appeal discussed that one test was inconclusive and one test was positive. Finally, the court found that "a conclusory statement that there are different and more up to date DNA techniques and parroting the statute" could not warrant an evidentiary hearing. Thus, the district court found that Blake did not meet the statutory requirements for testing under K.S.A. 2020 Supp. 21-2512. Blake timely appealed.

## ANALYSIS

Blake's only claim on appeal is that the district court erred when it denied his postconviction motion for DNA testing under K.S.A. 2020 Supp. 21-2512. Blake argues that he met the statutory requirements for postconviction DNA testing. More specifically, he argues that the district court erred in not ordering testing or retesting of Blake's penile glans swab, Blake's penile shaft swab and extract, and J.D.'s rectal DNA extract. Blake

6

argues the district court should have set aside his convictions or, at a minimum, it should have afforded him a full evidentiary hearing on the matter.

The State argues that the district court did not err in summarily denying Blake's motion for DNA testing because his request did not meet the requirements of K.S.A. 2020 Supp. 21-2512. The State asserts that Blake is not entitled to an evidentiary hearing because the files and records available to the district court conclusively showed that such testing could not lead to exculpatory evidence. The State also argues that Blake did not explain what new or advanced DNA testing is available for retesting of materials.

The parties agree on our standard of review. The district court's summary denial of a K.S.A. 2020 Supp. 21-2512 motion for DNA testing presents a question of law subject to unlimited review. *State v. Hernandez*, 303 Kan. 609, 613, 366 P.3d 200 (2016).

Postconviction DNA testing is governed by K.S.A. 2020 Supp. 21-2512, which provides, in relevant part:

> "(a) Notwithstanding any other provision of law, a person in state custody, at any time after conviction for murder in the first degree . . . or for rape . . . may petition the court that entered the judgment for forensic DNA testing (deoxyribonucleic acid testing) of any biological material that:
> (1) Is related to the investigation or prosecution that resulted in the conviction;
> (2) is in the actual or constructive possession of the state; and
> (3) was not previously subjected to a DNA testing, or can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results.
> . . . .
> "(c) The court shall order DNA testing pursuant to a petition made under subsection (a) upon a determination that testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongfully convicted or sentenced." K.S.A. 2020 Supp. 21-2512(a)(1)-(3), (c).

7

K.S.A. 2020 Supp. 21-2512(a) only allows those convicted of murder in the first degree or rape to petition the sentencing court for DNA testing. But some cases have extended the statute to cover other convictions in response to equal protection challenges. For example, in *State v. Denney*, 278 Kan. 643, 653-54, 101 P.3d 1257 (2004), the Kansas Supreme Court held that K.S.A. 21-5212 permits DNA testing for someone convicted of aggravated criminal sodomy based on equal protection. The State does not dispute that Blake is within his statutory right to request postconviction DNA testing because he was convicted of aggravated sodomy.

When petitioned, the district court must decide whether the biological material sought to be tested qualifies for testing under K.S.A. 2020 Supp. 21-2512(a)(1)-(3). If the biological material qualifies for DNA testing, the district court must then decide whether testing may produce noncumulative, exculpatory evidence relevant to the petitioner's claim of wrongful conviction or sentencing. *State v. Lackey*, 295 Kan. 816, 820-21, 286 P.3d 859 (2012). To qualify for DNA testing, K.S.A. 2020 Supp. 21-2512(a)(3) requires that either (1) the biological material has never been tested or (2) the material could be retested with new and improved techniques. 295 Kan. at 821-22.

When a party moves for postconviction DNA testing under K.S.A. 2020 Supp. 21-2512, the "district court is charged with the responsibility of assessing the exculpatory and cumulative nature of each item proposed to be tested." *Lackey*, 295 Kan. at 824. Evidence is exculpatory when it "'tends to disprove a fact in issue which is material to guilt or punishment.'" *Hernandez*, 303 Kan. at 617 (citing *Lackey*, 295 Kan. at 823). "DNA evidence may be exculpatory if it tends to establish innocence based on an individual's identity." *State v. Johnson*, 299 Kan. 890, 894, 327 P.3d 421 (2014). Evidence need not be exonerating to be exculpatory. Instead, the evidence need only tend to establish the petitioner's innocence of the crime. 299 Kan. at 894.

Blake's written motion sought to have all DNA evidence tested or retested. On appeal, Blake only argues that the district court erred in denying his motion for (1) his penile glans swab; (2) his penile shaft swab and DNA extract; and (3) J.D.'s rectal DNA extract. The penile glans swab had been tested before trial for the presence of blood or semen but not for the presence of J.D.'s DNA. Blake does not renew the argument he made in district court for DNA testing of his fingernail scrapings, presumably because the record shows the State does not possess this evidence. An issue not briefed is considered waived or abandoned. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021).

As for the testing or retesting of the penile glans swab or the penile shaft extract, a review of the record here conclusively shows that this requested testing could not produce exculpatory evidence. The lack of J.D.'s DNA on these materials would not tend to prove or disprove any material fact related to the aggravated criminal sodomy charge. The complaint charging Blake with aggravated criminal sodomy alleged he penetrated J.D.'s anal opening with his penis or finger. But in J.D.'s written statement to a police detective, she wrote, "[Blake] put his finger in my butt." At trial, J.D. testified that "[Blake] put his finger in my bottom." Although she added that she did not actually see that it was Blake's finger, J.D. never testified that Blake penetrated her with his penis. J.D.'s trial testimony is corroborated by the fact that no semen was detected on the rectal swab. Because J.D. never alleged Blake used his penis for the assault, any evidence from his penis would not support his innocence of the aggravated criminal sodomy charge.

Perhaps more significantly, the evidence at trial already showed that Blake's penile and scrotum swabs tested negative or inconclusive for any contribution from J.D. This evidence was favorable to Blake, and he does not explain how testing or retesting these samples could lead to exculpatory evidence. If further testing reflected the presence of J.D.'s DNA anywhere on Blake's penis, this evidence would only strengthen the State's charges of aggravated criminal sodomy and aggravated indecent liberties with a child. And even if testing of the penile glans swab that was never tested for DNA conclusively

showed the lack of J.D.'s DNA, Blake is still faced with the evidence that his DNA was found on J.D.'s rectal swab, and J.D. testified that Blake put his finger in her bottom.

The only DNA evidence that hurt Blake's case at trial came from comparing J.D.'s rectal swab with Blake's known DNA. On direct appeal, this court noted that "[t]he first rectal swab taken from [J.D.] was inconclusive, but a test of another rectal swab reflected DNA profiles consistent with both [J.D.] and Blake. The likelihood of someone other than Blake contributing that DNA was one in 2.6 trillion in the Caucasian and Hispanic populations." *Blake*, 2006 WL 3353770, at *2. The testing of the rectal swabs consumed all available samples, but the DNA extraction was preserved.

Under K.S.A. 2020 Supp. 21-2512(a)(3), for the district court to order retesting of the rectal DNA extract, Blake must show that the extract "can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results." In Blake's motion for postconviction DNA testing, he parroted the language of the statute and alleged there were "different and newer DNA techniques that would provide a reasonable likelihood of more accurate and probative test results." Blake's attorney did not elaborate on this claim at the hearing in district court. On appeal, Blake asserts that this allegation "is supported by the fact that now more than 15 years has passed since original DNA testing. This gap in time should amount to a sufficient showing to clear subsection (a)(3)."

Blake's argument is unpersuasive. A conclusory statement that more than 15 years has passed since the original DNA testing is not enough to show that retesting with new DNA techniques will provide a *reasonable likelihood* of more accurate and probative results. Blake was not specific on how retesting would provide more accurate results, and he did not explain what new or advanced DNA testing is now available. As the district court stated in its written order: "Parroting the statute does not create a substantial issue requiring any further analysis." Blake argues on appeal that he should have been granted

an evidentiary hearing to develop this claim. But Blake needed to at least identify what evidence he intended to produce at such an evidentiary hearing before the district court could properly grant one. Otherwise, a defendant will always receive an evidentiary hearing any time he or she files a postconviction motion for DNA testing quoting the language of the statute. Because Blake failed to identify what evidence he intended to offer to show that retesting the rectal DNA extract would provide a reasonable likelihood of more accurate results, the district court did not err in denying this request.

Finally, Blake's motion for DNA testing alleged that there were "[m]ajor [d]iscrepancies in [the] results" of the DNA testing performed before the trial. But there is nothing in the record to support this claim. The only significant "discrepancy" in the DNA evidence presented at trial was that a first rectal swab taken from J.D. was inconclusive, but a test of a second rectal swab reflected DNA profiles consistent with both J.D. and Blake. Shelly Steadman, the forensic scientist who presented the DNA evidence at trial, explained there was only sufficient material on the first rectal swab to create a partial DNA profile, but there was sufficient material on the second rectal swab to create a full DNA profile leading to more accurate results. Blake has never produced any evidence or claimed to be able to produce any evidence to rebut this testimony.

In sum, the biological material Blake seeks to have tested or retested fails to qualify for DNA testing or such testing could not produce exculpatory evidence impacting Blake's convictions or sentence. As a result, the district court did not err in summarily denying Blake's motion without conducting a full evidentiary hearing.

Affirmed.